[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 8 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 9 
The appellant, Quang Ngoc Bui, appeals from the denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P. On June 12, 1986, the appellant was convicted of the murder of his three children, an offense made capital by § 13A-5-40(a)(10), Ala. Code 1975.[1] In accordance with §§13A-5-45 and -46, Ala. Code 1975, a sentencing hearing was held before the jury, after which the jury, by a vote of 10-2, returned an advisory verdict recommending that the appellant be sentenced to death. The trial court, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced the appellant to death by electrocution.
This court and the Alabama Supreme Court affirmed the appellant's conviction and death sentence. Bui v. State,551 So.2d 1094 (Ala.Cr.App. 1988), aff'd, 551 So.2d 1125 (Ala. 1989). On April 22, 1991, the United States Supreme Court vacated the Alabama Supreme Court's affirmance and remanded the case for consideration in light of Powers v. Ohio,499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which holds that a defendant, regardless of race, has standing to raise a Batson[2]
challenge to the state's exercise of peremptory strikes against black prospective jurors. See Bui v. Alabama, 499 U.S. 971,111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). Thereafter, pursuant to a directive from the Alabama Supreme Court, see Ex parte Bui,627 So.2d 848 (Ala. 1991), this court remanded the case to the trial court with instructions that that court conduct a hearing on the state's use of its peremptory strikes. Bui v. State,627 So.2d 849 (Ala.Cr.App. 1992). After an evidentiary hearing, the trial court found that the state's use of peremptory strikes against black prospective jurors was not based on race. On return to remand, this court disagreed and reversed the appellant's conviction and sentence, holding that the state had engaged in intentional discrimination in its use of peremptory strikes. Bui v. State, 627 So.2d 849 (Ala.Cr.App. 1992). The Alabama Supreme Court, however, reversed this court's judgment and affirmed the appellant's conviction and sentence in Bui v.State, 627 So.2d 855 (Ala. 1992). The United States Supreme Court denied certiorari review in Bui v. State, 508 U.S. 975,113 S.Ct. 2970, 125 L.Ed.2d 669 (1993). All issues cognizable on direct appeal have been scrutinized, including those cognizable under the "plain error" doctrine.
The appellant filed his Rule 32 petition on November 9, 1994. The trial court held a lengthy evidentiary hearing on the allegations in the appellant's petition on October 27, 1995, and, in a thorough 24-page order, denied all relief on January 3, 1996. Judge Charles Price, the circuit judge who presided over the appellant's trial, also presided over the evidentiary hearings on the Rule 32 petition.
The essential facts of this case were recited by this court in Bui v. State, 551 So.2d at 1098-99, and are as follows:
 "This case arises out of an incident which occurred around midnight on the night of February 5-6, 1986, at appellant's residence, located at 3081 Simmons Road in Montgomery. Around midnight, Montgomery uniformed police officers, in response to a disturbance call, went to appellant's residence. Appellant's estranged wife had become concerned about the safety of her children, who were with appellant, and had asked the police to check on them. Upon arriving at the residence, the officers knocked on the door and, after considerable delay, appellant's mother-in-law, who also lived at the residence, opened the door. The officers told her that they wanted to talk with appellant and see the children. The mother-in-law went to notify appellant and, after some delay, returned to the door without appellant. The officers insisted on seeing him and the children, and the mother-in-law tried again, without success, to get appellant to come to the door. Finally, at the insistence *Page 11 
of the police, the mother-in-law admitted the officers to the residence, and the officers entered appellant's bedroom, where they discovered appellant and the bodies of his three children, Phi Ngoc Bui (age 8), Julie Quang Bui (age 7), and April Nicole Bui (age 4), lying on the bed.
 "The first officer in the room observed a large kitchen-type knife beside appellant on the bed. As the officers approached appellant, he seized the knife and struck at the officers three times before the officers were able to take the knife away from him. The three children were dead, and their bodies were covered with blood. Each child's throat had been cut. The fatal wounds were remarkably similar — an incision on the right side of the neck of each child, which severed the jugular vein and caused the child to bleed to death. Appellant had cuts on each side of his neck, and on one side, the jugular vein had been 'nicked.' Although appellant was bleeding, the wounds were not life-threatening. Appellant's wounds were self-inflicted. At first, appellant refused medical assistance, and he was restrained with handcuffs so that the paramedics could administer first aid. Appellant was transported to the hospital, where he received further treatment and stitches. While at the hospital, appellant asked an officer if his wife were coming, and when the officer said that he did not know, appellant said, 'I cut my kids. I didn't want her to get them.' He also stated several times that he wanted to 'die with [his] babies.' After being treated at the hospital, appellant was released to the police and transported to police headquarters. Shortly after arriving at police headquarters and being advised of his rights, in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), appellant made a statement admitting that he killed the children because he was mad at his wife and did not want her to have them.
 "The record discloses that Mr. and Mrs. Bui had experienced marital difficulties for several years. There had been several separations, and appellant suspected that his wife was seeing other men. At the time of the murders, Mrs. Bui had been absent from the home for two days and, during part of this time, she was in the company of a male friend. During the two days preceding the murders, Mrs. Bui called appellant several times on the telephone, and during these telephone conversations, appellant urged his wife to return home and made threats implying that if she did not, she might never see him and the children alive again. One such call occurred at approximately 11:00 on the night of the murders. Appellant told Mrs. Bui she would have to get there within 15 minutes if she wanted to see the children alive again. During this conversation, Mrs. Bui heard one of the children crying in the background. Shortly after this call, Mrs. Bui called the Montgomery Police Department to have someone check on the children. After waiting 15 minutes, appellant 'lost his temper,' he said in a confession, and killed the children.
 "Appellant did not testify at any stage of the proceedings. He presented witnesses who testified that he was a 'hard worker' and supported his family. Mrs. Bui testified that he was a loving and caring father; however, on cross-examination, she stated that he had a violent temper and had threatened to harm her and the children on numerous occasions during the marriage. Mrs. Bui also testified, on cross-examination, that appellant admitted to her that he killed the children because he was mad at her for not coming home and because he thought she was 'running around on him.' The fact that appellant killed the children is not disputed. Appellant's theory of defense, as disclosed in the opening statements of his counsel, was two-fold: (1) appellant is guilty of manslaughter instead of capital murder because the acts were caused by a sudden heat of passion caused by legal provocation, or (2) appellant was insane at the time of the killings. Appellant presented the testimony of a psychiatrist and a 'cross-cultural' counselor in support of his insanity plea."
 I.
In his petition, the appellant presents numerous claims regarding the performance of *Page 12 
his counsel, most alleging acts and omissions of counsel at trial. He contends that as a result of counsel's alleged errors, he was denied the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."
466 U.S. at 687, 104 S.Ct. at 2064.
"The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under 'prevailing professional norms,' was 'reasonable considering all the circumstances.' " Daniels v. State,650 So.2d 544, 552 (Ala.Cr.App. 1994), cert. denied, 488 U.S. 1051,109 S.Ct. 884, 102 L.Ed.2d 1007 (1989), quoting Strickland,466 U.S. at 688, 104 S.Ct. at 2065. "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland,466 U.S. at 690, 104 S.Ct. at 2066.
The claimant alleging ineffective assistance of counsel has the burden of showing that counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). "Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall 'outside the wide range of professionally competent assistance.' [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066." Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v.State, 629 So.2d 6 (Ala.Cr.App. 1992), cert. denied,511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State,484 So.2d 531 (Ala.Cr.App. 1985). "This court must avoid using 'hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance." Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Cr.App. 1994).
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987). *Page 13 
 "Even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068."
Daniels, 650 So.2d at 552.
 "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."
Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted inThompson v. State, 615 So.2d 129, 132 (Ala.Cr.App. 1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
In a Rule 32 proceeding, the petitioner has "the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala.R.Crim.P. See Fortenberry v. State, 659 So.2d 194
(Ala.Cr.App. 1994), cert. denied, 516 U.S. 846, 116 S.Ct. 137,133 L.Ed.2d 84 (1995); Wilson v. State, 644 So.2d 1326
(Ala.Cr.App. 1994); Elliott v. State, 601 So.2d 1118
(Ala.Cr.App. 1992).
The appellant's lead counsel at trial was Richard Shinbaum, an attorney with approximately 12 years of experience at the time of the appellant's trial in 1986.[3] Before his appointment to defend the appellant, Shinbaum had represented two capital murder defendants. William Abell, another experienced attorney, was appointed as co-counsel to assist Shinbaum. Shinbaum and Abell also represented the appellant on his direct appeal. In the way of general preparation for the appellant's trial, Shinbaum and Abell obtained and made use of materials from the Capital Representation Resource Center, a consortium of prominent experts on defending capital cases. The appellant called Shinbaum to the stand to testify at the evidentiary hearing on his Rule 32 petition. Abell was not called as a witness at the hearing.
Shinbaum testified that he talked to numerous potential witnesses in preparing for the appellant's trial, including the appellant's wife, Jeannie Bui, as well as Jeannie Bui's entire family, a minister of the church the appellant and his children attended, the appellant's employer, the police officers involved in investigating the case, persons from the Department of Forensic Sciences, a woman in South Alabama who knew the appellant, and persons from a university "in the Carolinas" who had "some experience in Asian matters."[4] (R. 34.)
The trial court specifically found Shinbaum to be a credible witness at the evidentiary hearing and credited Shinbaum's accounts of his pretrial preparation and investigation. (C. 286.)
It was Shinbaum's opinion that the state's case against the appellant was compelling. In addition to strong photographic and videotape evidence of the appellant's involvement in the offense, the appellant had given a confession to the police. Because counsel believed at the time that an attempt to win an outright acquittal of the appellant would be futile, Shinbaum and Abell developed a strategy of presenting an insanity defense and a "cross-cultural" defense at the appellant's trial. The appellant's counsel sought to show that the appellant, at the time of the offense, "was unable to appreciate the consequences of his actions, could not distinguish between right and wrong, was out of touch with reality, and lacked the substantial capacity *Page 14 
to appreciate the criminality of his conduct." Bui v. State, 551 So.2d at 1101. The thrust of the cross-cultural defense, in broad terms, was that the appellant's values and perceptions were formed by the Vietnamese culture of which he was a product, that the appellant had experienced overwhelming difficulties in assimilating to life in the United States after his involuntary departure from his homeland, that the appellant was despondent because of his wife's infidelities, that the appellant's state of mind at the time of the offense and his actions in killing his children were to some degree understandable — even "normal" — in terms of the Vietnamese culture, and that, therefore, the law should not hold him culpable to the fullest extent for his actions and at least not culpable of the offense of capital murder. Shinbaum and Abell obtained the assistance of two experts, Dr. Marina S. Tulao and Dr. Quan Cao, to present the appellant's insanity and cross-cultural defenses.[5]
The appellant's case at trial was summarized as follows by the trial court:
 "Bui's trial attorneys presented a not-guilty-by-reason-of-insanity defense and a cross-cultural defense at this trial. Bui's attorneys presented these defenses through the following lay witnesses: Jeannie Bui, Lena Thornton, Mike Carpenter, Officer J.G. Wood, Donnie Thompson, and Judy Thompson. The lay witnesses testified that Bui had not come to the United States voluntarily and [that he] missed his family in Vietnam. These witnesses also described a change in Bui's behavior several weeks before the murders. Jeannie Bui testified that just days before the murders, Bui had watched a movie about Vietnam that had depressed him. On the night the children were killed, Bui told Jeannie Bui over the phone that he was going to take the children to Vietnam with him.
 "The defense also presented testimony, through lay witnesses, that Jeannie Bui was running around on Bui and that this was bothering him. The defense also presented evidence that Jeannie Bui and Mike Carpenter had attempted to set up Bui on a possession of marijuana charge. The defense effectively presented the stresses that Bui was under on February 6, 1986, through these lay witnesses, and the defense called two experts to establish the not-guilty-by-reason-of-insanity defense and cross-cultural defense: Dr. M.S. Tulao and Dr. Quan Cao. Dr. Tulao was a psychiatrist who was a member of the State Lunacy Commission at the time of Bui's trial. Dr. Tulao received his medical training at the University of the Philippines. Shinbaum chose Dr. Tulao, in part, because he considered him to have had a good knowledge of the oriental culture, and [because] he was on the Lunacy Commission.[6] Dr. Tulao testified that when he interviewed Bui, Bui talked about his family in Vietnam and denied that his children were dead. In Dr. Tulao's further opinion, Bui was very depressed when he talked with him. Bui told Dr. Tulao that he heard voices telling him to do it before he killed his children. Dr. Tulao testified that Bui was suffering from an acute psychotic reaction at the time of the crime. In Dr. Tulao's opinion, Bui was unable to appreciate the consequences of his actions, and he was totally out of touch with reality when he committed the crime. In Dr. Tulao's further opinion, Bui did not have the capacity to appreciate the criminality of his conduct and did not have the capacity to conform his conduct to the requirements of the law at the time of his crime.[7]
 "Dr. Quan Cao was also called by the defense to establish the cross-cultural defense. Dr. Cao has a Ph.D. degree in *Page 15 
cross-cultural training. In addition, Dr. Cao was born in Vietnam. Dr. Cao testified that Bui had several risk factors from his refugee experience that would cause stress in his life: (1) [he was] ex-military personnel; (2) he did not leave Vietnam voluntarily; and (3) he was unable to communicate with his family in Vietnam. Dr. Cao testified that Bui was having the following difficulties at the time of his crime: (1) he was missing his family in Vietnam (watched movie about Vietnam); (2) he was obsessed with the fact that his wife was running around on him; and (3) he was suffering from survivor's guilt 10 years after the fact. Next Dr. Cao explained the differences between American culture and Vietnamese culture. Dr. Cao explained that in Vietnam, if a man's wife was running around on him, it would be a 'loss of face.' Had Bui been in Vietnam, he would have returned Jeannie Bui to her family to 'save face.' Dr. Cao also testified that since Bui was living in the United States, the only way Bui felt he could 'save face' was by killing himself and his children."[8]
(C. 289-91.)
 A.
The appellant, who was indigent, initially contends that Alabama's statutory scheme for compensating attorneys who represent indigent defendants in capital cases, § 15-12-21(d), Ala. Code 1975, denied him the right to effective assistance of counsel because, he says, his attorneys were not provided with funds sufficient to mount an adequate defense. Section15-12-21(d) provides, in pertinent part:
 "In cases where the original case involves a capital offense or a charge which carries a possible sentence of life without parole, the limits shall be $1,000.00 for out-of-court work, plus payment for all in-court work. . . ."
Alabama courts have consistently upheld § 15-12-21(d) against constitutional challenges. See Ex parte Smith, 698 So.2d 219
(Ala. 1997); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985);McNair v. State, 706 So.2d 828 (Ala.Cr.App. 1997); May v.State, 672 So.2d 1307 (Ala.Cr.App. 1993), writ quashed,672 So.2d 1310 (Ala. 1995); Hallford, 629 So.2d at 11-12. In Exparte Grayson, the Alabama Supreme Court rejected a claim that Alabama's method of compensating attorneys in capital cases denied the defendant the right to effective assistance of counsel, stating:
 "These contentions are made on the premise that lawyers will not provide effective assistance unless paid a certain amount of money. But the legal profession requires its members to give their best effort in 'advancing the "undivided interest of [their] client[s]." ' Polk County v. Dodson, 454 U.S. 312, 318-19, 102 S.Ct. 445, 449-50, 70 L.Ed.2d 509 (1981). This Court, in Sparks v. Parker, 368 So.2d 528, 530 (Ala. 1979), quoted the New Jersey Supreme Court as follows:
 " 'We know of no data to support a claim that an assigned attorney fails or shirks in the least the full measure of an attorney's obligations to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and pride. [State v. Rush, 46 N.J. 399, 405-07, 217 A.2d 441, 444-45 (1966).]' "
479 So.2d at 79-80.
Thus, we reject the notion that Alabama's statutory scheme for compensating attorneys in capital cases, in and of itself, denies a defendant effective representation. Although the burden of pleading and proof is on the appellant, Rules 32.3 and 32.6(b), Ala.R.Crim.P., he alleged no facts in his petition and presented no evidence at the hearing to support his claim that the compensation scheme in § 15-12-21(d) caused his counsel's performance to fall "outside the wide range of professionally competent assistance." Strickland,466 U.S. at 690, 104 S.Ct. at 2066. Because the appellant has not shown "by a preponderance of the evidence the facts necessary *Page 16 
to entitle [him] to relief," Rule 32.3, we find no merit in his claim.[9]
 B.
The appellant contends that his trial counsel rendered ineffective assistance in failing to present testimony from members of the family that sponsored the appellant upon his arrival in the United States in 1975 as a refugee from Vietnam. Specifically, he maintains that members of the Williams family of Daphne, Alabama, had "intimate dealings" with him after he arrived in this country and could have provided the jury with "a wealth of mitigating information" concerning his "history of depression" and his difficulties in assimilating to American culture. (Brief of the appellant at 12.) He argues that such information would have bolstered his insanity defense and would have influenced the jury's sentencing recommendation and the trial court's sentencing determination.
We first note that there is no suggestion in the record that before trial the appellant's counsel was advised, or had strong reason to suppose, that members of the Williams family could provide information or testimony useful to the appellant's defense. Although Shinbaum met with the appellant on several occasions before trial, the appellant appears not to have related any specific information about the Williamses to Shinbaum. The Williamses did not contact the appellant's counsel before trial. At the evidentiary hearing on his Rule 32 petition, the appellant presented testimony from four members of the Williams family concerning their sponsorship of the appellant after his arrival in this country, their familiarity with the appellant's forced departure from, and homesickness for, Vietnam, and their firsthand knowledge of the various difficulties the appellant experienced adjusting to American life while residing in Daphne. It appears that the Williamses functioned as a surrogate family for the appellant during his first year in this country. The Williamses stated at the hearing that they would have been willing to testify about these matters at the appellant's trial if they had been asked to do so.
The record reflects that the appellant moved from Daphne and from close contact with the Williamses sometime in 1975 or 1976, going first to New Orleans and then settling in Montgomery a short time later. Significantly, all four members of the Williams family who testified at the hearing indicated that they had had little personal contact with the appellant since his move from Daphne. Sybil Williams Wilson, who was the family member most frequently in touch with the appellant after he moved from Daphne, testified that she spoke with the appellant (apparently by telephone) "twice a month." (R. 70.)
With reference to the alleged value of the Williamses' testimony, the trial court found as follows in its order denying the appellant's petition:
 "All of the members of the sponsor family testified about Bui's adjustment difficulties when he arrived in the United States in 1975. The record shows these witnesses testified that Bui was living with two other Vietnamese refugees when they became his sponsor family. They testified that Bui was slower than the other men in learning *Page 17 
English and that he was often depressed because he was not learning as quick as the others. They also testified that Bui missed his family more than the other men. However, these witnesses all testified that Bui learned to speak English, obtained a job, and did eventually adjust to American life. It is clear from the testimony of these witnesses that they had very little contact with Bui since Bui left their home in 1975 or 1976. Thus, these witnesses knew nothing about Bui's life in 1986."
(C. 292-93.) (Emphasis supplied.)
In ruling that the appellant's trial counsel did not render ineffective assistance in failing to secure the Williamses' testimony at trial, the trial court further noted that considerable evidence concerning the appellant's piteous situation upon being forced to flee from his homeland, his difficulties adjusting to life in this country, and his history of depression was brought out at his trial through the testimony of several lay witnesses and the testimony of Drs. Tulao and Cao. It might fairly be said that this testimony was the centerpiece of the appellant's insanity defense and his cross-cultural defense. It is readily apparent from the record that most of the lay witnesses who did testify at the appellant's trial had regular contact with the appellant around the time of the offense, unlike the Williamses, and were therefore better situated than the Williamses to provide information relating to the appellant's actions and apparent mental state around the time the murders were committed. The trial testimony of these lay witnesses and of Drs. Tulao and Cao sounded the same theme as the testimony of the Williamses at the evidentiary hearing. Several of these lay witnesses also gave testimony at trial attesting to the appellant's good character, describing the appellant as a good and caring father and an excellent employee who was extremely trustworthy.
The appellant appears to suggest that testimony from the Williamses at his trial would have been particularly helpful to his defense because, he says, when living in Daphne, he had often spoken to them about his experiences during the Vietnam war and they had witnessed behavior that suggested the psychologically traumatic effects of his war experiences. Some of the Williamses testified at the hearing that the appellant appeared particularly "shaken" when recounting stories about his service on a gunboat during the war. This cannot be gainsaid; however, we think the appellant's counsel goes too far when, in her brief to this court, she seeks to characterize David Williams's testimony concerning an incident at a Mardi Gras parade in 1975 or 1976, where the appellant had run for cover upon being startled by the sound of a firecracker going off, as "clear indicia of a [war-related] post-traumatic stress related episode" by the appellant. (Brief of the appellant at 15.) In any event, at trial, the appellant's counsel placed considerable emphasis on the significance of the appellant's experiences in Vietnam and presented several witnesses, including Drs. Tulao and Cao, who testified concerning this subject.
We are unpersuaded by the appellant's argument that testimony from the Williamses at his trial would have been so compelling and qualitatively different from the testimony that was actually presented that there was a reasonable likelihood that the outcome of the trial would have been different. We find that the testimony proffered by the Williamses was, at best, cumulative to the testimony presented at the appellant's trial.
 "There has never been a case where additional witnesses could not have been called. The appellant presented relatives and personal friends who, upon interview, were found to testify on his behalf. We refuse to set a standard that a court may be reversed because it did not hear unoffered testimony from still more friends and relatives. We also refuse to say that a member of the bar is guilty of ineffectiveness for not calling every witness and friend who was willing to testify."
State v. Tarver, 629 So.2d 14, 21 (Ala.Cr.App. 1993).
We cannot say that the failure of the appellant's counsel to call the Williamses as witnesses at the appellant's trial was unreasonable. Nor can we say that there is a reasonable probability that, but for counsel's actions, the results of the proceedings would *Page 18 
have been different. We agree with the trial court's ruling that the appellant's trial counsel did not render ineffective assistance in this regard.
 C.
The appellant also contends that his trial counsel rendered ineffective assistance in failing to contact members of the appellant's family who were still living in Vietnam or persons living in the United States who had known the appellant when he lived in Vietnam. The appellant maintains that these persons could have provided additional information about his background that would have been useful as mitigation evidence in his defense and that could have aided his mental health experts in evaluating him.
At the evidentiary hearing, the appellant's trial counsel testified that he did not know with any certainty in 1986 whether the appellant had any family alive in Vietnam. He stated that he had met with the appellant a number of times before the trial and on these occasions had talked extensively with the appellant about his life in Vietnam and had gathered that the appellant himself did not know whether he had family members still alive in Vietnam. The appellant's trial counsel also expressed doubts whether he would have been able to contact any family the appellant may have had in Vietnam, because at the time of the appellant's trial, "the United States did not have diplomatic relations with Vietnam." (R. 29.)
While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, "this duty only requires a reasonable investigation." Singleton v. Thigpen,847 F.2d 668, 669 (11th Cir. 1988), cert. denied, 488 U.S. 1019,109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). SeeStrickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v.State, 551 So.2d 435 (Ala.Cr.App. 1989), cert. denied,495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel's obligation is to conduct a "substantial investigation into each of the plausible lines of defense." Strickland,466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). "A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made."466 U.S. at 686, 104 S.Ct. at 2063. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id.,466 U.S. at 691, 104 S.Ct. at 2066.
There is nothing in the record to suggest that the appellant's trial counsel ignored matters that should reasonably have alerted him to the value of contacting additional persons who might have information about the appelant's background that might be presented in his defense. See Cochran v. State, 548 So.2d 1062 (Ala.Cr.App.), cert. denied, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208 (1989). Through his conversations with the appellant and with numerous potential witnesses familiar with the appellant, counsel already had at his disposal information concerning the appellant's background. This information was used in the appellant's defense. As noted above, the appellant's counsel presented several witnesses at trial who testified concerning the appellant's experiences in Vietnam.
In its order denying the appellant's petition, the trial court found that the appellant's counsel entered trial well prepared and knowledgeable about the appellant's character and background; the order states, "It is conclusive from the trial transcript and from the evidence presented at the Rule 32 hearing that trial counsel had investigated Bui's Vietnamese background, his experience in the Vietnam war, and the trauma associated with his refugee experiences." (C. 292.) The trial court specifically found that the appellant's counsel did an excellent job of linking the appellant's experiences in Vietnam and as a refugee in this country to his defense of not guilty by reason of insanity and to his cross-cultural defense. We will not say that the actions of counsel, in failing to conduct additional investigation, were unreasonable under the circumstances. *Page 19 
In addition, the appellant fails to establish any prejudice in this regard. He makes no convincing showing that evidence beneficial to his defense would have been forthcoming had his counsel attempted to contact his family in Vietnam or persons living in the United States who knew the appellant when he lived in Vietnam. Consequently, he has not established that the outcome of the trial probably would have been different had counsel acted differently. See Hubbard v. State, 584 So.2d 895,904 (Ala.Cr.App. 1991), cert. denied, 502 U.S. 1041,112 S.Ct. 896, 116 L.Ed.2d 798 (1992) (Rule 20, Ala.R.Crim.P.Temp., petitioner failed to prove trial counsel was ineffective for failing to request state funds for an investigator because there was no evidence establishing that an investigator would have gathered information in addition to what trial counsel already had at their disposal); Singleton, 847 F.2d 668 (no showing of prejudice allegedly resulting from inadequate investigation by trial counsel where habeas petitioner failed to proffer the type of mitigating evidence that would have been found had trial counsel conducted further investigation).
We agree with the trial court's ruling that trial counsel did not render ineffective assistance by failing to contact these additional witnesses.
 D.
The appellant also contends that his trial counsel rendered ineffective assistance by "undermining the ability of mental health experts to adequately evaluate him" and thereby preventing him from presenting sufficient evidence to show that he was suffering from a severe emotional disturbance at the time of the crime and that he was not legally culpable for his offense. In this regard, the appellant also argues that the experts called as witnesses by his trial counsel — Drs. Tulao and Cao — did not spend sufficient time with him and failed to employ adequate diagnostic methods to make an appropriate evaluation of his mental state when the offense was committed.
With regard to this claim, the trial court stated:
 "Bui contends in Paragraph 33(f) of his Rule 32 petition that trial counsel failed to obtain essential expert assistance needed to establish that Bui was not legally culpable for this offense. Bui asserts that trial counsel did not facilitate adequate contact between Bui and the defense experts.
 "As set forth above, trial counsel presented a not-guilty-by-reason-of-insanity defense and a cross-cultural defense. Trial counsel did an excellent job of presenting these defenses. Dr. Tulao testified that Bui was psychotic when he committed the crime and was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law when he committed the crime. Dr. Cao also testified that Bui had several difficulties in his life at the time of the crime. The murder of his children and his attempted suicide were an attempt on Bui's part to 'save face.'[10] Again, defense attorneys spent sufficient time with the expert witnesses. The jury heard their testimony and rejected it. This was the jury's prerogative.
 "Bui has failed to establish a reasonable probability that but for trial counsel's failure to facilitate adequate contact between Bui and his experts the outcome of his trial would have been different."
(C. 292-95.)
The appellant's trial counsel testified as follows with regard to his decision to obtain the services of Drs. Tulao and Cao:
 "I hired Dr. Tulao as a psychiatric expert. Dr. Tulao has been with the State of Alabama and had been on the Lunacy Commission; and I had asked Dr. Tulao to come in and examine Mr. Bui concerning psychiatric needs. Then I tried to contact or get a psychologist in the cross-cultural field out of the west coast who had testified in a previous case involving psychological defenses, but that witness was not *Page 20 
available; so we contacted or we got the name of a Dr. Cao, . . . who was working out of Tallahassee, Florida, who had some experience in the cross-cultural field.
". . . .
 "Dr. Tulao interviewed Mr. Bui on I believe more than one occasion at the Montgomery County jail. I did not actually participate in those interviews, so I don't know anything about what went on.
". . . .
 "Dr. Cao, I know, met with Mr. Bui at the jail because at one point, I had tape-recordings of those interviews that I listened to.
". . . .
 "I had had experience with Dr. Tulao in other criminal cases, usually always on the other side. And Dr. Tulao appeared to be probably the only psychiatrist for the State of Alabama that I would have considered to be a straight shooter. And Dr. Tulao was also of Philippine extraction and had a good knowledge of the Oriental culture. I felt that Dr. Tulao would be able to communicate with Quang Bui very ably. And by using the State — by using somebody that was on the Lunacy Commission at the time, it was my belief that I could get around having the State request an evaluation at Taylor Hardin, which would have been — which I have always found to be skewed and if they examined somebody, which they seldom do, in a thorough fashion, that it would have been against us.
". . . .
 "Dr. Cao, I chose because we are talking about a new field at the time. In '86 — you have to remember, we are not talking about '95. We are talking about in '86. And in 1986, post-traumatic stress syndrome and the cross-cultural aspects of the Vietnam war were a new and emerging aspect of law. I had to go where I could to find the witness."
(R. 27-37.)
In an effort to establish the inadequacy of the expert testimony put on in his defense, the appellant called Kim Cook, a clinical social worker, to testify at the evidentiary hearing. The trial court summarized Cook's testimony as follows:
 "Bui also called Kim Cook to testify at the Rule 32 hearing. Ms. Cook was born in North Vietnam. She has a master's degree in social work, [and] is known professionally as a clinical social worker. Ms. Cook testified about Bui's life in Vietnam, his Vietnam war experiences, and his adjustment difficulties when he arrived in the United States. Ms. Cook based her testimony on a review of letters written by Bui when he lived in Vietnam and from talking with people who knew Bui in Vietnam and when he first arrived in the United States in 1975. Ms. Cook testified that Bui suffered from depression in Vietnam and was also a loner in Vietnam. In Ms. Cook's opinion, Bui had not gone through the necessary states to adjust to life in the United States. It is conclusive from the trial record that testimony given by all the forestated fact witnesses at the Rule 32 hearing was presented at trial, and the jury obviously was not persuaded in Bui's favor by the testimony. Likewise here, the Court is hard-pressed to be persuaded by Ms. Cook's testimony or to find her testimony favorable for the petitioner. Ms. Cook appears to hold the view that unless one is of Vietnamese birth, he or she, regardless of training, cannot understand or relate to or accurately evaluate Mr. Bui. Therefore, she would take issue with Dr. Tulao's training and testimony at trial. She also takes issue with Dr. Cao's testimony because he is not 'clinically trained.' Such views by Ms. Cook [are] nonsense and lack[ ] credibility."
(C. 293-94.)
Thus, the trial court heard testimony offering conflicting views of the adequacy of the expert testimony put on at trial and found that the appellant's claim concerning this issue was without merit. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. We believe that trial counsel's action in using Dr. Tulao and Dr. Cao to present the insanity *Page 21 
and cross-cultural defenses was a decision based on reasonable investigation and was one of sound trial strategy.
We are aware that this court, in its opinion on the appellant's direct appeal, suggested that a cross-cultural defense may be incompatible with an insanity defense, inasmuch as an underlying premise of the cross-cultural defense is that a defendant's criminal action could have been a product of the culture from which he comes and was "conscious, rational and, acceptable" in terms of that culture, and that, therefore, the defendant's action was definitionally "sane" under the circumstances. Bui v. State, 551 So.2d at 1104. See Holly Maguigan, Cultural Evidence and Male Violence: Are Feminist andMulticulturalist Reformers on a Collision Course in CriminalCourts? 70 N.Y.U. L.Rev. 36, 73-74 (1995). However, an attorney's presentation of somewhat inconsistent alternative defenses is not necessarily defective performance. In the appellant's case, moreover, the cross-cultural and insanity defenses were not entirely inconsistent, insofar as both defenses, in essence, urged mitigation of the appellant's culpability for acts that ordinarily would be deemed criminal to the utmost degree, and both defenses offered "excuses" (or at least mitigating explanations) for acts of seemingly incomprehensible cruelty.
Furthermore, the line between the two defenses is not so easily drawn. An acknowledged strain of the cross-cultural defense — and one clearly recognizable in the case put on by the appellant's trial counsel — is one where the defendant "does not deny knowledge that the offense charged was a crime, but [argues] that the actions are the involuntary result of the stress of acculturation or assimilation into a new culture." Maguigan, 70 N.Y.U. L.Rev. at 48-49 (footnotes omitted). "Often, appellate courts analyze this . . . type of claim as avariant of the traditional doctrine of excuse based on mentaldisease or extreme emotional disturbance." Id. at 49 n. 47 (citing People v. Poddar, 10 Cal.3d 750, 518 P.2d 342,111 Cal.Rptr. 910 (1974), and People v. Aphaylath, 68 N.Y.2d 945,502 N.E.2d 998, 510 N.Y.S.2d 83 (1986)) (emphasis added). Paradoxically, then, seemingly contradictory defenses may share a core similarity. In any event, we are loathe to find fault with the appellant's trial counsel for attempting to make the most of the unfavorable facts of a case he was presented with and for advocating as many plausible explanations for the appellant's actions as the evidence might support, even where those explanations may not have been entirely consistent.
Although the appellant denigrates the adequacy of the examinations conducted by Dr. Tulao and Dr. Cao for purposes of evaluating his mental state, we note that the conclusions expressed at the evidentiary hearing by the appellant's own witness, Kim Cook, concerning the significance of the appellant's background and experiences in Vietnam and the stress he faced adjusting to life in this country did not differ significantly from the conclusions presented at trial by Dr. Tulao and Dr. Cao. While we recognize that this court, in its opinion on direct appeal, was critical of the methods used by Dr. Tulao and Dr. Cao, most of that criticism was aimed toward finding support for the jury's rejection of the appellant's insanity defense. Thus, we emphasized only the weaknesses in the appellant's defense.[11] The conclusions expressed by Dr. Tulao and Dr. Cao in their trial testimony supported the insanity and cross-cultural defenses put on by the appellant's trial counsel. It appears to us that the appellant is arguing that his trial counsel was ineffective for failing to employ mental health experts who would have applied a more rigorous methodology than was applied by Dr. Tulao and Dr. Cao but who would have *Page 22 
reached essentially the same conclusions reached by these witnesses. The appellant does not consider the possibility that a more rigorous (or at least different) methodology might have led to expert conclusions less favorable to his defense. In fact, the appellant's trial counsel stated that he believed a mental health examination conducted by someone other than Dr. Tulao was likely to result in findings unfavorable to the appellant's insanity defense. The appellant offered no evidence at the evidentiary hearing that testimony more beneficial to his defense than the testimony given by Dr. Tulao and Dr. Cao would have been forthcoming had his trial counsel followed a different tack with respect to obtaining psychiatric and cross-cultural experts.[12]
We cannot say that trial counsel's action in presenting these experts was unreasonable considering all the circumstances. Nor can we say that there is a reasonable probability that, but for counsel's actions, the results of the proceedings would have been different. Accordingly, we agree with the trial court's ruling that the appellant's trial counsel did not render ineffective assistance in this regard.
 E.
The appellant also contends that his trial counsel rendered ineffective assistance in failing to present at the sentencing phase of his trial "other important mitigation about his good character." Specifically, he contends that his trial counsel should have called (1) Xuan Nguyen, who, he says, knew him as a teenager and could have testified that he grew up in a good, hardworking family; (2) Yen Nguyen, who, he says, lived in the same village with him while in Vietnam; and (3) Earl Fisher, one of his former employers, who, he says, would have testified that he was a very diligent parent who often missed work-related social gatherings to spend time with his children.
Based on our review of the trial transcript and the evidentiary hearing on the appellant's petition, we find that the testimony of these witnesses would have been merely cumulative. As the trial court found in its order denying the appellant's petition:
 "Trial counsel also called the following witnesses to testify at the penalty phase of his trial: Shirley Werner, Lena Thornton, and Walt Werner. These witnesses testified that Bui was a good father and a good employee. These witnesses testified about Bui's obsession with Jeannie Bui and about Jeannie Bui setting up Quang Bui on a possession of marijuana charge. Finally, Lena Thornton, the grandmother of the victims, asked the jury not to take Bui's life; he did not deserve the death penalty. The jury also had before it the testimony of all the witnesses who testified at the guilt phase of the trial."
(C. 291-92.)
We cannot say that trial counsel's performance was deficient simply because he did not call every witnesses who conceivably may have been willing to testify at the sentencing phase of his trial. See State v. Tarver, 629 So.2d at 21. "In a challenge to the imposition of a death sentence, the prejudice prong of theStrickland inquiry focuses on whether 'the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " Stevens v.Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied,507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993), quoted inDaniels, 650 So.2d at 568. We agree with the trial court's ruling that the appellant's trial counsel did not render ineffective assistance in this regard.
 F.
The appellant contends that his trial counsel was ineffective because, he says, "counsel presented no evidence whatsoever *Page 23 
in support" of a motion for a change of venue he had filed. The appellant says that holding his trial, which, he says, concerned a highly publicized crime, in Montgomery County increased the likelihood that he would be convicted of capital murder and would be sentenced to death "on the basis of arbitrary factors." At the hearing on the appellant's petition, the appellant's trial counsel testified as follows:
 "We filed the change of venue motion more as a precautionary method. Our worst fear in this case was a change of venue. We felt that if we were going to sell the psychological defense and the defense relating to the Vietnam culture, that we had a greater chance of getting jurors that might understand that in Montgomery County than any other county, in spite of the pretrial publicity. If this case had been moved to a county that might have had less knowledge of the case, such as Clay or Cullman County, God knows what would have happened. I mean, or worse than that, it could have been moved to Mobile County, which had a history of being antagonistic to Orientals [sic]. It could have been even worse. Well, it couldn't have been worse, but it would have been just as bad. And, you know, we don't have — when you file a change of venue motion, you don't have any control over where the judge sends it. He sends it to the nearest county free of prejudice from the effects of publicity. And if you had gotten out of the metro Montgomery area to certain places in North Alabama or in Southwest Alabama, it would have been even worse. Well, it couldn't have been worse. It would have been just as bad, as it turns out."
(R. 42-43.)
In its order denying the appellant's petition, the trial court found that the decision of the appellant's counsel not to pursue his motion for a change of venue "was a reasonable strategic decision by trial counsel." (C. 286-87.) We agree. "Strategic choices made after thorough investigation of relevant law and facts are virtually unchallengeable."Lawley, 512 So.2d at 1372. We will refrain from the use of hindsight in evaluating trial counsel's decisions. SeeHallford, 629 So.2d at 9; State v. Tarver, 629 So.2d at 21.
We further concur in the trial court's finding that the appellant failed to prove that his trial counsel could have presented evidence sufficient to change venue. (C. 287.) Thus, the appellant has failed to establish either prong necessary to grant him relief under Strickland as to the change of venue issue.
 G.
The appellant also contends that his trial counsel rendered ineffective assistance in failing to adequately investigate and cross-examine crucial witnesses for the prosecution. In its order denying the appellant's petition, the trial court stated as follows:
 "Bui alleges in Paragraph 33(b) of the Rule 32 Petition that trial counsel failed to investigate and cross-examine the following critical witnesses for the prosecution: Investigator E.B. Spivey, Dr. Karl Kirkland, Officer Terry Jett, Allen Greenwood, and Dr. Allen Stillwell.
 "Shinbaum testified at the Rule 32 hearing that he talked to the police officers and to the persons from the Department of Forensic Sciences who were involved in this case before trial. Shinbaum testified that he objected to Dr. Kirkland's testimony and believed that the court would not allow Dr. Kirkland to testify. The trial transcript reflects that Shinbaum did object to Dr. Kirkland's testimony and thought this Court would not allow Dr. Kirkland to testify concerning Bui's sanity. Shinbaum also testified that during the trial his trial strategy changed because it became apparent that the State was not going to prove the identity of the victims. Shinbaum testified that this affected the defense's objections and the cross-examination of the State's witness.
 "It is clear from what is set forth above that Shinbaum did investigate these witnesses. It is also clear that Shinbaum did object to Dr. Kirkland's testimony. Further, Shinbaum made a strategic decision not to make certain objections and to change his cross-examination because of the State's failure to prove the identity of *Page 24 
the victims. A lawyer's 'heat-of-trial decisions not to object' should not be second-guessed by those having the benefits of hindsight. Fleming v. Kemp, 748 F.2d 1435, 1450 (11th Cir. 1984), cert. denied, 475 U.S. 1058[, 106 S.Ct. 1286, 89 L.Ed.2d 593] (1986). Trial counsel's 'heat-of-trial decision not to object' and to change his cross-examination did not remove his performance from the wide bounds of professional performance. Further, Bui presented no evidence in support of this claim at the Rule 32 hearing. Therefore, Bui failed to establish a reasonable probability that but for trial counsel's failure to perform a more thorough cross-examination on these witnesses, the outcome of this trial would have been different, see Strickland, supra."
(C. 287-88.)
The record supports the trial court's findings. We agree with the trial court that counsel's performance in this regard was not deficient.
 H.
The appellant also contends that his trial counsel rendered ineffective assistance in failing to spend meaningful time with the appellant in order to gain a complete understanding of the events that led to the crime and to explore the unique cultural issues that were present in the case. With regard to this claim, the trial court found:
 "This assertion is just not true. The record shows that Shinbaum visited with Bui on a number of occasions before trial. Shinbaum testified that it was difficult to communicate with Bui because he was very depressed. Although Shinbaum had difficulty discussing this case with Bui, because of his depression, it is clear from the trial transcript and from Shinbaum's testimony at the Rule 32 hearing that he understood the events that led up to the crime and that he had explored the unique cultural issues in this case. Shinbaum presented the following evidence at trial:
 "(1) Bui did not come to the United States voluntarily;
 "(2) Bui was unable to communicate with his family in Vietnam and missed [his family] a lot;
 "(3) Bui was a good father and a good employee;
 "(4) Jeannie Bui was running around on Quang Bui and it was driving him crazy;
 "(5) Jeannie Bui had set Quang Bui up on a possession of marijuana charge;
 "(6) Bui was suffering from a psychotic episode on the night of the offense and was not sane; and
 "(7) Bui had 'lost face' because of Jeannie Bui's conduct and felt the only way to 'save face' was to kill his children and himself.
 "It is conclusive from what was presented at trial that Shinbaum understood the events leading up to Bui's crime. He also understood the cultural implications and presented these facts to the jury. Trial counsel's performance was not deficient. Further, Bui has failed to prove that there was additional relevant evidence that the jury could have considered. Bui has failed to establish a reasonable probability that but for trial counsel's failure to spend meaningful time with Bui that the outcome of his trial would have been different. Strickland, supra."
(C. 295-96.)
We agree with the trial court that counsel's performance in this regard was not deficient.
 I.
The appellant also contends that his trial counsel rendered ineffective assistance in failing to obtain a Vietnamese interpreter who, he says, could have assisted him in his own defense. In its order denying the appellant's petition, the trial court stated as follows:
 "Shinbaum testified at the Rule 32 hearing that he could communicate with Bui and that Bui understood English. Shinbaum also testified that Bui understood the charges against him, and in his opinion, it was not necessary to have a Vietnamese interpreter at Bui's trial. Further, as already *Page 25 
stated, Bui's sponsor family testified that Bui learned to speak English in 1975, some eleven years before this crime. Thus, there was no need for a Vietnamese interpreter.
 "Trial counsel's performance was not deficient and Bui was not prejudiced because Bui understood English and understood the charges against him. This allegation of ineffective assistance is completely without merit."
(C. 296-97.)
We agree with the trial court's ruling that counsel's performance in this regard was not deficient.
 J.
The appellant presents several other claims with regard to the alleged ineffectiveness of his trial counsel. The appellant has merely listed these allegations and has presented no argument. The trial court summarized these allegations as follows:
 "Bui presents the following allegations of ineffective assistance of counsel in his Rule 32 Petition:
 "(1) Paragraph 33(d) — Trial counsel failed to object and even acquiesced to Bui's absence at two [pretrial] hearings that were held in connection with proceedings in this case;
 "(2) Paragraph 33(g) — Trial counsel failed to object to numerous instances of misconduct by the District Attorney;
 "(3) Paragraph 33(i) — Trial counsel failed to request instructions to which Bui was entitled and also failed to object to improper instructions that were given;
 "(4) Paragraph 33(m) — Trial counsel improperly agreed to the suspension of the gag order during a pre-trial hearing, and allowed photographs to be taken of Bui; and
 "(5) Paragraph 33(n) — Trial counsel failed to seek discovery of mitigating evidence that was contained in Bui's police statements which had not been reduced to writing."
(C. 298-99.)
With regard to these claims, the trial court found:
 "Bui presented no evidence concerning these allegations of ineffective assistance of counsel at the hearing on the Rule 32 Petition. Trial counsel's performance was not deficient where it was not error when Bui was not present when his attorney allowed a photographer into the courtroom before trial and for a hearing on a motion, where there was no prosecutorial misconduct, where the trial court's instructions were proper and where there is no evidence of what mitigating evidence was contained in one of Bui's statements which was not reduced to writing. Further, Bui presented no evidence to show how he was prejudiced by these alleged instances of ineffective assistance. Bui failed to establish at the Rule 32 hearing a reasonable probability that but for these instances of ineffective assistance that the outcome of his trial would have been different."
(C. 299.)
With specific reference to the claim by the appellant that his trial counsel failed to object to an instruction by the trial court that, he says, improperly diminished the jury's responsibility in the sentencing process, in violation ofCaldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633,86 L.Ed.2d 231 (1985), the trial court also found:
 "Trial counsel's performance was not deficient and Bui was not prejudiced thereby because the jury instruction was not improper. It is well settled that '[t]he comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that the sentence verdict was "advisory" and [a] "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell v. Mississippi.. . .' Martin v. State, 548 So.2d 488 at 494 (Ala.Cr.App. 1988). In this case, the trial court's instruction was an accurate statement as to the jury's sentencing role and that reference *Page 26 
did not violate Caldwell v. Mississippi."
(C. 297.)
The record supports the trial court's findings in this regard. With reference to the appellant's claim concerning his alleged absence from certain pretrial hearings, we note that even if the appellant was absent from these hearings, he has been " 'unable to suggest or demonstrate any possibility of prejudice resulting from [his] absence.' " DeBruce v. State,651 So.2d 599, 620 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624
(Ala. 1994) (capital defendant's absence from pretrial motion hearing harmless to defendant) (quoting Harris v. State,632 So.2d 503, 512 (Ala.Cr.App. 1992)). " ' "[E]ven improper exclusion of a defendant from a 'critical' portion of the trial does not automatically require reversal, if in the particular case the defendant's absence was harmless beyond a reasonable doubt." ' " DeBruce, 651 So.2d at 620, quoting Ex parte Stout,547 So.2d 901, 904 (Ala. 1989), quoting in turn Polizzi v.United States, 550 F.2d 1133, 1138 (9th Cir. 1976).
As this court observed in Stringfellow v. State,485 So.2d 1238, 1243 (Ala.Cr.App. 1986), " '[e]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made.' " We agree with the trial court's ruling that the appellant failed to present any evidence in support of these allegations and that his counsel's performance has not been shown to be deficient with regard to these matters.
 K.
The appellant also contends that his "counsel's performance on appeal was deficient." In its order denying the appellant's petition, the trial court stated as follows:
 "Bui asserts in paragraph 33(q) of the Rule 32 Petition that counsel failed to provide effective assistance on appeal to the Court of Criminal Appeals and the Alabama Supreme Court. Bui alleges the following in paragraph 33(q): 'Trial counsel did not raise on appeal violations of petitioner's rights in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Alabama State Constitution and laws.'
 "Bui presented no evidence concerning this claim at the hearing on the Rule 32 petition. Bui has yet to identify the issues that should have been, but were not raised on appeal. Bui has not [established] that but for trial counsel's failure to raise these undisclosed issues[,] the outcome of the appeal would have been different. Moreover, since Bui has not identified these issues, this Court cannot conclude that counsel's performance was deficient."
(C. 298.)
"Counsel need not raise and address each and every possible issue on appeal to render effective assistance of counsel. The process of 'winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.' Smith v. Murray, 477 U.S. 527, 536,106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986)." Brownlee v. State,666 So.2d 91, 99 (Ala.Cr.App. 1995). See also Johnson v. State,612 So.2d 1288, 1303 (Ala.Cr.App. 1992). This court on direct appeal searched the record for any error that may have adversely affected the appellant's substantial rights and found none. Rule 45A, Ala.R.App.P. See Bui v. State, 551 So.2d at 1117. "A finding of no plain error is one factor to consider when assessing the performance of [appellate] counsel."Fortenberry, 659 So.2d at 200, quoting Hallford, 629 So.2d at 10.
We agree with the trial court that the appellant neither alleged facts nor offered evidence to support this claim. Accordingly, he failed to meet the specificity requirements of Rule 32.6(b), and the burden of pleading and proof required by Rule 32.3 to show that his appellate counsel was deficient or otherwise ineffective.
After reviewing the overwhelming evidence against the appellant, including his confession, we believe that while his trial and appellate counsel may have made certain strategic choices that the appellant now questions, counsel did not render ineffective *Page 27 
assistance. An accused is entitled " 'not [to] errorless counsel, and not [to] counsel judged ineffective by hindsight, but [to] counsel reasonably likely to render and rendering reasonably effective assistance.' " Thompson, 615 So.2d at 134, quoting Haggard v. Alabama, 550 F.2d 1019, 1022 (5th Cir. 1977). We find no merit to any of the appellant's allegations of ineffective assistance of counsel. The appellant has not shown "by a preponderance of the evidence the facts necessary to entitle [him] to relief" on this issue. Rule 32.3, Ala.R.Crim.P.
 II.
The appellant contends that "the state failed to turn over to the defense exculpatory evidence in violation of Brady v.Maryland [, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),] and Alabama state and federal law." In his petition, he alleged the following:
 "The District Attorney and prosecuting officials did not make available the complete prosecution file in violation of Ex parte Monk, 557 So.2d 832
(Ala. 1989), and state and federal requirements in capital cases. Consequently, exculpatory material and critical mitigating evidence were withheld in violation of Temporary Rule 18 [now Rule 16, Ala.R.Crim.P.] and Brady v. Maryland, 373 U.S. 83
[83 S.Ct. 1194, 10 L.Ed.2d 215] (1963). The withholding of this information denied Mr. Bui his rights to due process, a fair trial and a reliable sentencing proceeding in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama state law."
(C. 32-33.)
The appellant presents no specific factual basis for this claim. As the trial court noted in its order denying the appellant's petition, the appellant did not present any evidence in support of this claim but instead merely "chose to preserve the Brady claim simply for the record as notice that it was alleged." (C. 277.) The trial court further found:
 "Bui was given the entire prosecution file (with the exception of what the Court found to be work product) for the Rule 32 proceedings. There was no evidence presented at the Rule 32 hearing that any exculpatory material was withheld by the prosecution. Thus, as previously stated, this claim was simply preserved for the record. The claim has no merit and is due to be and is hereby DENIED."
(C. 300.)
In order to prove a Brady violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence was of a character favorable to his defense, and (3) that the evidence was material. Ex parte Cammon,578 So.2d 1089, 1091 (Ala. 1991); Hill v. State, 651 So.2d 1128, 1131
(Ala.Cr.App. 1994). Here, the appellant failed to offer anything in support of his Brady claim or in support of his suggestion that the state violated the "open file" established in Ex parte Monk. Because the appellant failed to meet the specificity requirements of Rule 32.6(b) and has not shown "by a preponderance of the evidence the facts necessary to entitle [him] to relief," Rule 32.3, we find no merit in his claim. SeeDaniels, 650 So.2d at 562. Furthermore, to the extent that the appellant's claim relies upon facts and circumstances that were known to him at the time of trial, it is precluded under Rules 32.2(a)(3) and (5), Ala.R.Crim.P., because it could have been raised at trial or on direct appeal, but was not.[13]
 III.
As the trial court noted in its order denying the appellant's petition, the appellant conceded at the hearing on his Rule 32 petition that numerous claims in his petition were precluded by the procedural bars of Rule 32.2(a). This court has recognized that "[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed." State v. Tarver, 629 So.2d at 19. See Horsley v.State, 675 So.2d 908 (Ala.Cr.App. 1996); *Page 28 Grayson v. State, 675 So.2d 516 (Ala.Cr.App. 1995), cert. denied, ___ U.S. ___, 117 S.Ct. 309, 136 L.Ed.2d 225 (1996);Brownlee, 666 So.2d at 93; Cade v. State, 629 So.2d 38
(Ala.Cr.App. 1993), cert. denied, 511 U.S. 1046,114 S.Ct. 1579, 128 L.Ed.2d 221 (1994).
We find that the following claims in the appellant's petition are procedurally barred under Rules 32.2(a)(2) and (4), Ala.R.Crim.P., because they were raised and addressed at trial and on direct appeal:
1. The appellant's claim that the trial court erred by limiting defense counsel from propounding voir dire questions to the jury venire inquiring into racial and cultural biases and attitudes concerning the insanity defense. See Bui v.State, 551 So.2d at 1110.
2. The appellant's claim that his statements to the police, which were admitted in evidence, were illegally and involuntarily obtained. See Bui v. State, 551 So.2d at 1106-08.
3. The appellant's claim that the evidence did not support the trial court's finding that the capital offense for which he was convicted was especially "heinous, atrocious, or cruel" compared to other capital offenses. See Bui v. State, 551 So.2d at 1109.
4. The appellant's claim that the prosecutor made improper remarks during closing arguments at the guilt phase of his trial. See Bui v. State, 551 So.2d at 1111-12.
5. The appellant's claim that the prosecutor made improper remarks during closing arguments at the sentencing phase of his trial. See Bui v. State, 551 So.2d at 1109-10.
6. The appellant's claim that the state's failure to disclose the existence of a taped conversation between the appellant's wife and police officers violated his right to a fair trial and due process. See Bui v. State, 551 So.2d at 1114.
We find that the following claims in the appellant's petition are procedurally barred under Rules 32.2(a)(2) and (5), Ala.R.Crim.P., because they were raised and addressed at trial and could have been, but were not, raised on direct appeal:
1. The appellant's claim that the trial court erred in denying his motion for a change of venue.
2. The appellant's claim that the trial court erred in not allowing defense counsel to conduct individual voir dire of venire-members.
3. The appellant's claim that the trial court improperly allowed state's witness Mike Carpenter to invoke his Fifth Amendment right against self-incrimination.
4. The appellant's claim that the trial court erred in not sanctioning the prosecutor for alleged noncompliance with the grand jury secrecy requirement.
5. The appellant's claim that the trial court erred in failing to charge the jury on the lesser included offense of murder.
6. The appellant's claim that the prosecutor engaged in improper conduct when he made arguments based on religion and allegations concerning crimes not charged.
7. The appellant's claim that the trial court erred in not instructing the jury that it could not arbitrarily ignore the expert evidence on insanity and that it should consider the cross-cultural evidence in determining his mental state.
8. The appellant's claim that the state failed to comply with pretrial discovery orders when it failed to turn over to the defense his statements, the substance of Dr. Karl Kirkland's testimony, the state's voir dire questions, and the state's requested jury charges.
9. The appellant's claim that the trial court erred in allowing the testimony of Dr. Karl Kirkland.
10. The appellant's claim that the trial court erred in allowing his wife to testify, where her competence had not been assessed before she took the stand and where she had broken the rule that the trial court had invoked to exclude witnesses during the testimony of other witnesses.
11. The appellant's claim that photographs and a videotape of the crime scene should not have been received into evidence. *Page 29 
We find that the following claims in the appellant's petition are procedurally barred under Rules 32.2(a)(3) and (5), Ala.R.Crim.P., because they could have been raised at trial and on direct appeal, but were not:
1. The appellant's claim that the prosecutor engaged in improper conduct when he asked improper questions on direct- and cross-examination of witnesses.
2. The appellant's claim that the prosecutor improperly commented on the fact that he did not testify.
3. The appellant's claim that the prosecutor improperly argued to the jury that it should find the appellant guilty of capital murder so that the prosecutor could ask for the death penalty at the sentencing phase of the trial.
4. The appellant's claim that the prosecutor engaged in improper conduct when he argued "nonstatutory aggravating circumstances."
5. The appellant's claim that the prosecutor made arguments that undermined the jury's responsibility in determining punishment, in violation of Caldwell v. Mississippi,472 U.S. 320, 106 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
6. The appellant's claim that the trial court improperly instructed the jury that its sentencing phase verdict was advisory, in violation of Caldwell v. Mississippi.
7. The appellant's claim that the trial court improperly instructed the jury on the "heinous, atrocious, or cruel" aggravating circumstance.
8. The appellant's claim that the trial court improperly instructed the jury on reasonable doubt.
9. The appellant's claim that the trial court failed to properly instruct the jury on the voluntariness of the appellant's statements.
10. The appellant's claim that the trial court improperly heightened the burden of proof necessary to establish the defense of insanity.
11. The appellant's claim that his rights were violated by the excessive security measures taken during his trial.
12. The appellant's claim that his absence from certain pretrial hearings violated his rights to due process and a fair trial.
13. The appellant's claim that the trial court failed to provide adequate funds for experts and thus violated Ake v.Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
14. The appellant's claim that the trial court's failure to provide an interpreter during all proceedings related to his capital murder trial violated his rights to due process and a fair trial.
15. The appellant's claim that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment.
16. The appellant's claim that the trial court's jury instructions on the capital offense improperly included references to reckless murder and felony murder.[14]
As noted above, this court on direct appeal searched the entire transcript for error, pursuant to Rule 45A, Ala.R.App.P. Had this court found anything that would merit reversal, even if it had not been raised on appeal, it would have reversed the judgment and remanded this case for a new trial. After evaluating the evidence presented at the evidentiary hearing on the appellant's Rule 32 petition, we conclude that the trial court correctly denied the petition.
AFFIRMED.
McMILLAN, BROWN and BASCHAB, JJ., concur.
COBB, J., recuses.
[1] Section 13A-5-40(a)(10) makes capital "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."
[2] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986).
[3] In its order denying the appellant's petition, the trial court stated, "Shinbaum is, and was at the time of Bui's trial, a criminal defense lawyer of considerable experience and ability with a heavy criminal practice, handling every type of criminal case." (C. 284.)
[4] The record reflects that the appellant came to the United States in 1975 as a refugee from Vietnam, where he had been serving in the South Vietnamese army when the country fell to the North Vietnamese. The fact that the appellant was Vietnamese and the circumstances that brought him to this country were matters of some importance to his defense.
[5] For informative and sometimes critical discussions of "cultural evidence" and the cross-cultural defense, see Doriane Lambelet Coleman, Individualizing Justice ThroughMulticulturalism: The Liberals' Dilemma, 96 Colum. L.Rev. 1093 (1996), and Holly Maguigan, Cultural Evidence and MaleViolence: Are Feminist and Multiculturalist Reformers on aCollision Course in Criminal Courts? 70 N.Y.U. L.Rev. 36 (1995). The appellant's case is specifically mentioned in both articles. See Coleman at 1139 n. 223; Maguigan at 73-75, 93 n. 213.
[6] Shinbaum testified to this effect at the evidentiary hearing. See Part I.D. of this opinion.
[7] See this court's discussion of Dr. Tulao's testimony in Bui v.State, 551 So.2d at 1100-01.
[8] See this court's discussion of Dr. Cao's testimony in Bui v.State, 551 So.2d at 1101-02.
[9] Arguably, there is a sound legal basis for applying the procedural bars found in Rule 32.2(a) to the appellant's claim. Most of the usual factors disinclining an attorney from alleging his or her own ineffectiveness are not present in a claim of this nature, because an attorney claiming that he or she was deprived of funds sufficient to mount an adequate defense is not necessarily admitting to having made poor strategic choices or unprofessional mistakes, but is instead asserting that despite the best intentions to act in the client's behalf, the attorney's performance has been improperly hampered by forces beyond the attorney's control. It might be argued, then, that the appellant's attorneys at trial and on appeal had little disincentive, and ample opportunity, to present a claim that the compensation scheme in § 15-12-21(d) prevented them from rendering legally effective assistance, if they believed this to be the case. Nevertheless, we recognize that there may be some degree of reluctance on the part of an attorney to confess that his or her performance was deficient, whatever the cause. Therefore, in the present case, we think it proper and sufficient to dispose of the appellant's claim "on its merits," of which none have been shown. See McNair, 706 So.2d at 840, and Hallford, 629 So.2d at 11-12 (where Rule 32 petitioners' ineffective assistance claims premised on identical grounds were addressed on the merits and rejected).
[10] We note that at trial Dr. Cao did not hold himself out as a psychologist, that he stated that he was not qualified to pass upon the issue of the appellant's sanity, and that he was not allowed to testify as to his opinion concerning the appellant's sanity at the time of the commission of the offense.
[11] For instance, this court noted with disapproval that Dr. Tulao's opinion that the appellant was suffering from an acute psychosis at the time of the killings was primarily based upon what the appellant had told him during two interviews, each lasting 30 to 35 minutes. We were also critical of the circumstances under which Dr. Cao interviewed the appellant and of Dr. Tulao's failure to administer standard psychological tests to the appellant. We note Dr. Tulao's testimony that he did not use psychological tests as diagnostic tools in his evaluation of the appellant "because of cultural differences and because he felt that the tests were 'geared toward westerners not Asians.' " Bui, 551 So.2d at 1101.
[12] This court noted in its opinion on direct appeal that the appellant had no history of mental disease or defect. We also took note of the evidence presented at the appellant's trial from which the jury could have reasonably concluded that the appellant's actions in killing his children were not the result of a mental disease or defect but instead were motivated by anger, jealousy, and a desire for revenge against his wife. Buiv. State, 551 So.2d at 1104-05. The appellant has not come forward with any evidence that, if it had been presented at his trial, would have made such a determination by the jury less likely.
[13] The state asserted these grounds of preclusion in its answer to the appellant's petition. (C. 75-76.) As noted in Part III of this opinion, "[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed." State v. Tarver, 629 So.2d at 19.
[14] We note that this court took notice of this issue as part of its plain-error review on the appellant's direct appeal and found that the trial court's instructions, taken as a whole, were proper and that there was no plain error in the court's charge. See Bui v. State, 551 So.2d at 1115-17. Thus, the issue was "addressed on appeal." See Rule 32.2(a)(4). *Page 30